| | |
|---|---|
| JOSEPH BELLINO, | ) |
| | ) Case No. 04 C 7686 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge |
| | ) Arlander Keys |
| NORMAN Y. MINETA, in his | ) |
| official capacity as | ) |
| Secretary of the Department | ) |
| of Transportation, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

In 1968, Joseph Bellino began working for the Federal
Aviation Administration as an air traffic controller at O'Hare
International Airport in Chicago. He has worked as an air
traffic controller on and off since that time. From 1984 through
2002, Mr. Bellino worked in the Terminal Radar Approach Control
("TRACON"), a radar control facility that was, at the time,
physically located at O'Hare, along with the Tower, the other
component of O'Hare's air traffic control system. In 1996,
TRACON moved to Elgin, Illinois, and Mr. Bellino moved with it.

In February 2002, Mr. Bellino bid for and received a
position at the Tower at O'Hare; he has continued to work in the
Tower and to train to become fully certified at the Tower
(officially, he is referred to as a "developmental," meaning that
he is not yet fully certified at the Tower). Although both the
Tower jobs and the TRACON jobs involve air traffic control

duties, the jobs are very different in terms of how they are physically performed. The controller positions available at the TRACON involve duties that are performed, for the most part, while sitting down at a radar screen. In contrast, the air traffic controllers working in the Tower, perform their duties while standing, walking, and moving rapidly around the Tower, though they may also sit at times.

And there is another difference between the two jobs: consistent with an Agreement reached between the National Air Traffic Controllers Association (a union Mr. Bellino apparently helped to start) and the FAA, air traffic controllers working at the Tower receive, in addition to their base pay, a bonus – known as "controller incentive pay" or CIP – of 10% of their base pay; air traffic controllers working at TRACON received a CIP of just 1.4% of their base pay.[1]

In September 2002, while working in the Tower, Mr. Bellino stepped off a controller's stool – a box that is typically used by controllers to see across the Tower – and his left knee failed, causing injury. As a result, his right knee also sustained injury from having to bear consistently his full body

---

[1] Mr. Bellino has argued that the TRACON CIP was 1.6%, not 1.4%. And Craig Burzych, Mr. Bellino's union representative, testified to that effect as well. For present purposes, the exact percentage does not really matter; the bottom line is that air traffic controllers at the O'Hare Tower received a CIP bonus that was roughly 8.5% higher than the CIP bonus paid to air traffic controllers at the TRACON. The Court is using the 1.4% number here only because that number is supported in the documentary evidence.

weight. It is undisputed that the September 2002 knee injuries were actually reinjuries; Mr. Bellino first injured his knees in 1966, when he jumped out of a helicopter while on a tour of duty in Vietnam.

Mr. Bellino underwent bilateral total knee replacement surgeries in November 2002 and was off work for about six months. The parties dispute when Mr. Bellino returned to work and whether, when he did return, he returned with medical restrictions. Mr. Bellino claims he returned to work, with restrictions, on May 23, 2003; the defendant claims that he returned to work in April 2003, with a restriction that he work just four hours a day, and then returned to work without restrictions on May 23, 2003.

In either case, it is undisputed that, as soon as he returned to work at the Tower, Mr. Bellino began asking for a "reasonable accommodation," claiming that he was disabled because of his knees. Thereafter, the record reflects a back-and-forth exchange between FAA personnel, including Michelle Behm, who was Mr. Bellino's supervisor in the Tower, and Mr. Bellino, in which the FAA sought numerous clarifications and additional information, ostensibly to determine the full extent of Mr. Bellino's injuries, capabilities and limitations, and in which Mr. Bellino became increasingly frustrated and often accusatory.

Throughout this time, Mr. Bellino continued to experience

3

pain in his knees, and, in October of 2003, he underwent a left total knee arthroplasty, at which time the doctors discovered that he had a loose knee component that needed fixing. Even with that fix, however, Mr. Bellino claims to continue to suffer pain to this date, and he claims that his ability to stand and walk continues to be compromised.

On May 18, 2003, Mr. Bellino filed an equal employment opportunity complaint, claiming that he was discriminated and retaliated against because of his disability when the FAA refused to provide a reasonable accommodation. Mr. Bellino filed another EEO complaint in March 2004, claiming that the FAA's attempts to confirm his medical condition constituted retaliation. In July 2004, after Mr. Bellino indicated that he needed to take time off to avoid "plac[ing] aircraft and personnel in an unsafe situation," the FAA withdrew Mr. Bellino's medical clearance pending clarification of his medical condition. In August 2004, Mr. Bellino filed another EEO complaint claiming that the withdrawal of his medical clearance was retaliatory; in particular, Mr. Bellino claimed that he was being punished because of his age, his disability and his prior EEO activities. In August 2004, the FAA requested medical documentation from Mr. Bellino's doctor.

On September 9, 2004, the Department of Transportation issued the first of two Final Agency Decisions addressing Mr.

4

Bellino's various claims. In the first FAD, the DOT determined that Mr. Bellino was, in fact, disabled, but it nonetheless determined that Mr. Bellino could not make out a claim of discrimination based on a failure to accommodate, because he had been offered the very job he had requested – the TRACON job.

On October 21, 2004, Ms. Behm sent Mr. Bellino a letter advising him that, although his doctor said he could perform without limitation, she would again offer him an air traffic controller job at TRACON, but with the commensurate reduction in the CIP; that is, if he accepted the offer, he would receive the TRACON CIP, not the Tower CIP, resulting in a reduction in his overall pay of 8.6% of his base pay. Also in October 2004, the FAA advised Mr. Bellino not to report to work until the Office of Workers' Compensation Programs had released him to do so.

On May 11, 2005, the DOT issued its second Final Agency Decision in Mr. Bellino's case; this one addressed, inter alia, Mr. Bellino's claim that the withdrawal of his medical clearance constituted discrimination, and it determined that the FAA's reason for withdrawing the clearance was legitimate and non-discriminatory, not a pretext.

Mr. Bellino did not appeal either Final Agency Decision. Instead, on January 21, 2005, he sent letters to his supervisors and the flight surgeons, advising them that he had named them in a lawsuit filed in federal district court. He then filed a

lawsuit – *pro se* – on February 7, 2005. In his initial
complaint, he named as defendants the Secretary of the Department
of Transportation, Norman Mineta, as well as various Federal
Aviation Administration personnel, and he alleged violations of
the Rehabilitation Act and the Americans with Disabilities Act.
When the named defendants moved to dismiss the complaint, Mr.
Bellino hired a lawyer, and then, with the assistance of counsel,
he amended his complaint. The complaint that is currently before
the Court – the Second Amended Complaint, which was filed
September 29, 2005 – names only Secretary Mineta, but still
alleges discrimination and retaliation/hostile environment in
violation of both the Americans with Disabilities Act and the
Rehabilitation Act. In particular, Mr. Bellino alleges that,
despite his knee injuries and resulting disabilities, the FAA
refused to provide him with a reasonable accommodation, and that
the FAA otherwise discriminated and retaliated against him
because of his disability and because of his prior EEO
activities.[2]

The parties consented to proceed before a magistrate judge,
and the case was reassigned to this Court on April 19, 2006. On
September 9, 2006, the parties filed cross motions for summary
judgment. The Secretary filed a motion for summary judgment

---

[2]In addition to helping to start the air traffic controllers
union (the NATCA), Mr. Bellino served for a time as a union
representative for employees wanting to pursue EEO claims.

arguing that the plaintiff cannot prove his claim because (1) he was offered the very accommodation he sought, yet he refused it; (2) he cannot prove that he is disabled; and (3) he cannot prove that he suffered an adverse employment action. Mr. Bellino seeks summary judgment on both his failure to accommodate claim and on his retaliation and hostile environment claim. Alternatively, he seeks partial summary judgment on those elements of the claims for which there are no genuine issues of fact.

Discussion

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive summary judgment, the non-moving party must offer more than "mere conclusory" allegations. *Nowak v. St. Rita High School,* 142 F.3d 999, 1002 (7th Cir. 1998). *See also Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (the non-moving party must offer more than a "metaphysical doubt as to the material facts"). The non-moving party will lose on

summary judgment if he cannot present sufficient evidence to
support each element of his case for which he will bear the
burden of proof at trial. *Celotex,* 477 U.S. at 322. And the
Court will disregard all facts not properly supported by the
record. *Brasic v. Heinemann's Inc.,* 121 F.3d 281, 284 (7th Cir.
1997).

A.   Motions to Strike

Before turning to the merits of Mr. Bellino's claims, the
Court considers two motions to strike filed by Mr. Bellino. At
the outset, on summary judgment, the Court may consider any
evidence that would be admissible at trial. *See Stinnett v. Iron
Works Gym/Executive Health Spa,* 301 F.3d 610, 613 (7th Cir.
2002). At this stage, the evidence need not be admissible in
form, but it must be admissible in content. *Id.* The question of
admissibility, as well as the decision to grant or deny a motion
to strike exhibits as inadmissible, are vested in the district
court judge's sound discretion. *See, e.g., Credit General
Insurance Company v. Midwest Indemnity Corp.,* 916 F.Supp. 766,
771 (N.D. Ill. 1996).

Mr. Bellino first moves to strike all or at least part of
the secretary's Rule 56.1 Statement of Material Facts, and, as a
consequence, the secretary's motion for summary judgment as well.
In particular, he moves to strike paragraphs 8-11, 16, 24, 25,
27-32, and 43, arguing that they lack record citations and are

8

not supported by the record. That is simply not true. Contrary to Mr. Bellino's assessment, the challenged paragraphs do contain citations to the records, and the referenced documents are at least as supportive of the corresponding fact statements as are his record citations – indeed, in most cases more so.

Mr. Bellino also argues that paragraphs 50 and 51 mischaracterize his deposition testimony; again, he is simply wrong, and the motion to strike these paragraphs is denied.

Mr. Bellino next moves to strike paragraphs 1 and 3-41, arguing that they contain citations to documents that were either not properly authenticated, or were not properly identified. Tangentially, he moves to strike exhibits 1, 5, 7, 8, 11, 12, 14, 15, 17, 18, 20-47, and 49-58 on the ground that they were not properly authenticated. Initially, the Court notes that authentication "does not erect a particularly high hurdle" to admissibility. *United States v. Dhinsa,* 243 F.3d 635, 658-59 (2d Cir. 2001) (citing Fed. R. Evid. 901). Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The party offering the evidence is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United*

*States v. Pluta* 176 F.3d 43, 49 (2d Cir. 1999)(internal citation and quotation marks omitted). The proponent satisfies Rule 901 "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Id.* The opponent of the evidence bears the burden of showing that a genuine issue of authenticity exists. *Cf. Tyson v. Jones & Laughlin Steel Co.*, 958 F.2d 756, 761 (7th Cir. 1992). Mr. Bellino has failed to make such a showing here. For the most part, the challenged exhibits consist of documents included in the administrative proceedings relating to Mr. Bellino's claims. And Mr. Bellino's one-sentence challenge gives the Court no reason to doubt their authenticity – this is especially so because Mr. Bellino himself has introduced in connection with these summary judgment motions many of the very exhibits he challenges in this regard.

Next, Mr. Bellino moves to strike paragraphs 8, 11 and 26, arguing that are supported by documents that were not produced in discovery; relatedly, he moves to strike exhibits 6(1), 11, 15, 17 and 33. Exhibits 17 and 33 are addressed to him, and he makes no claim that he never saw or received them. Exhibit 6 is the NATCA/FAA agreement regarding the relevant CIPs, which is obviously known to Mr. Bellino. The Court will strike exhibits 11 and 15 (respectively, a progress note from Dr. Gregg Moga and a set of emails regarding Mr. Bellino's leave – both too

innocuous to warrant attention), as the Court did not rely on them.

Mr. Bellino moves to strike paragraphs 1, 2, 4-6, 9, 14, 22, 28, 31, 35, 36, 39, 42, 43 and 45 on the basis of relevance. These paragraphs are plainly relevant to his claims and the FAA's defenses to those claims, and his motion to strike these paragraphs borders on being frivolous.

He moves to strike paragraph 15, arguing that it is supported by deposition testimony in which the deponent had no personal knowledge; that is denied. The statements in this paragraph are supported by the cited testimony and evidence; Mr. Bellino obviously disputes these statements and, as such, properly noted as much in his response statement of facts.

Mr. Bellino moves to strike paragraph 28, arguing that it is supported by a "falsified exhibit." The exhibit on which this paragraph relies was authored by Mr. Bellino, but he alleges that the FAA has added and "intermixed" pages such that it makes no sense; nonetheless, he admits the substance of the challenged paragraph, see Plaintiff's Response to Defendant's Local Rule 56.1 Statement, ¶28, and the motion to strike is, therefore, denied.

In a second motion to strike, Mr. Bellino challenges several of the "additional exhibits" submitted by the Secretary. In particular, Mr. Bellino moves to strike exhibits 66, 67, 71, 72,

11

78, 87 and 88 on the ground that they were not produced during discovery; he moves to strike exhibits 66, 67, 71, 72, 74-80, 86 and 87 on the ground that they were not properly authenticated or identified in the record and they lack foundation and are hearsay; he moves to strike exhibit 65 (especially paragraph 7), arguing that the declarant's statements are not based on personal knowledge; and he moves to strike exhibit 69 (especially paragraphs 3, 4 and 6), arguing that the declarant's statements are not supported with record citations.

With regard to the latter, the Court disagrees; as stated in the declaration, Ms. Burl relied upon pay records that are unquestionably already a part of the file before the Court. Similarly, the motion to strike exhibit 71 is denied; the letter is addressed to Mr. Bellino, which means, even if it was never produced, he saw it; and the Court has no reason to question its authenticity – it is signed, and it contains a certified mail receipt number. The motion is denied as well as to exhibits 75 and 76; again, those are addressed to Mr. Bellino and to the extent required, they are authenticated by the declaration of Gwen Mitchell, the OWCP claims examiner. The motion to strike exhibits 65-67, 72, 74, 77-80, 86 and 87 is granted, if only because the Court neither considered, nor relied upon these exhibits.

B. Mr. Bellino's Discrimination Claim

Turning first to the merits of Mr. Bellino's discrimination claim, the Americans with Disabilities Act and the Rehabilitation Act[3] prohibit discrimination against a qualified individual with a disability because of the disability of that individual. 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *Sanchez v. City of Chicago*, No. 05 C 6801, 2007 WL 647485, at *5 (N.D. Ill. Feb. 28, 2007); *EEOC v. Sears, Roebuck & Co.,*, 417 F.3d 789, 796 (7th Cir. 2005)); *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006). To establish a claim for discrimination based upon a failure to accommodate, Mr. Bellino must offer evidence that: (1) he is a qualified individual with a disability; (2) the FAA was aware of his disability; and (3) the FAA failed to reasonably accommodate his disability. *Sanchez*, 2007 WL 647485, at *5 (citing *EEOC v.*

---

[3]The statutes, which are substantively identical, are used interchangeably in this opinion; the Rehabilitation Act applies only to entities receiving federal funding, while the ADA is not similarly limited, but the standards applied to determine whether a violation has occurred are the same. *See Washington v. Indiana High School Athletic Association*, 181 F.3d 840, 845 (7th Cir. 1999); *Silk v. City of Chicago*, 194 F.3d 788, 798 n.7 (7th Cir. 1999).

*Sears, Roebuck & Co.,,* 417 F.3d 789, 796 (7th Cir. 2005)).

The FAA argues that Mr. Bellino cannot prove the third element of this test; it argues that it did reasonably accommodate Mr. Bellino's disability and that it is, therefore, entitled to summary judgment on his failure to accommodate claim. It also argues, though less emphatically, that Mr. Bellino is unable to prove the first element of the test set forth above, that he cannot prove he is disabled within the meaning of the act.

The Court first considers whether Mr. Bellino can prove that he is a qualified individual with a disability. To prove that he is disabled, Mr. Bellino must show that he has a physical or mental impairment that substantially limits him in one or more major life activities. 42 U.S.C. §12102(2)(A); *see also Nese v. Julian Nordic Construction Co.*, 405 F.3d 638, 641 (7th Cir. 2005). In assessing whether Mr. Bellino has met his burden in this regard, the Court asks whether his condition constitutes an impairment under the ADA, whether the activity upon which he relies constitutes a major life activity, and whether the impairment substantially limits the performance of the major life activity. *Sears*, 417 F.3d at 797.

Mr. Bellino contends that he is significantly limited in terms of how far and how long he is able to walk. No one disputes that walking is a major life activity; the parties'

dispute centers on whether Mr. Bellino is actually limited in his ability to walk. To support its contention that he is not, the FAA cites to a number of statements made by Mr. Bellino himself to the effect that he is able to walk and get around, that he is completely mobile. Mr. Bellino contends that he made those statements years ago and only because he was trying to save his job; to support his contention that he is limited in his ability to walk, he notes that his doctors "diagnosed [him] with a permanent disability of walking as of May 23, 2003, continuing to the present." *See* Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 10.

Based on the evidence before it, the Court is persuaded that Mr. Bellino is substantially limited in the major life activity of walking. "Substantially limited," as is relevant for today's purposes, means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §1630.2(j)(1). First, the medical records support a finding of disability. Even before his revision surgery, Mr. Bellino's doctors released him to work with restrictions in terms of the number of hours he could work, and in terms of the types of movements he could perform. An April 3, 2003 Work/School Status

Report prepared by Dr. Ronald Silver of the Illinois Bone & Joint Institute noted that Mr. Bellino can return to work for just 4 hours per day. *See* Plaintiff's Motion for Summary Judgment, Exhibit 18. And a July 7, 2003 report prepared by Dr. M. Asselmeier of the DuPage Medical Group's Orthopedic Sports Medicine group, indicated that Mr. Bellino should engage in "no more than 30 min standing per hour." *Id.*, Exhibit 19. In the wake of Mr. Bellino's revision surgery, the restrictions became more clear. On April 26, 2004, Dr. Paprosky prepared a memorandum indicating that:

> at this point he [Mr. Bellino] can return to work at the air traffic control. It would be best for him in regard to his knee total knee arthroplasty, that if he could have a seated position without restrictions. I feel at this point that standing for more than 10 to 15 minutes in any given hour would be extremely difficult and would put added stress to his knee. Standing for prolonged period of time could cause excess swelling, which would inhibit his further rehabilitation.

Plaintiff's Exhibits in Support of Summary Judgment, Exhibit 20. This is consistent with a script Dr. Paprosky signed two days later, indicating that Mr. Bellino may "return to work on May 16 with sit down duties. No restrictions. No standing > 1-2 hrs." Plaintiff's Rule 56.1 Statement, Exhibit 21. The record also contains a memorandum prepared by Dr. Paprosky dated July 23, 2004; the memo summarizes Mr. Bellino's knee history and concludes: "[h]e is totally able to perform normal activities of daily living without significant pain or swelling and, as

mentioned, a sit-down job is not a problem with occasional

walking.  I do not believe that he will achieve maximum or

improved benefit to do significantly more than this."

Plaintiff's Exhibit 8.  The memo also states, after summarizing

the strenuous physical nature of the air traffic controller Tower

job, that

> it is my impression at this time that the patient is
> not going to be able to perform these particular duties
> at the O'Hare Tower, especially by the fact that any
> type of rapid movement like this does create some pain
> and swelling.  He is, however, able to perform a sit-
> down job, such as working at the radar screens, so this
> would be my recommendation at this time for the
> patient.

*Id.*  In support of his summary judgment motion, Mr. Bellino

submitted an affidavit from Dr. Paprosky, in which he states

that, since his revision surgery in October 2003 and up through

the present time, Mr. Bellino has suffered and continues to

suffer from pain and a decreased ability to walk and stand"; Dr.

Paprosky states that Mr. Bellino "had and continues to have

substantial problems with walking and standing," and that his

condition is permanent.  *See* Paprosky Affidavit, ¶¶10, 12-13

(attached as Exhibit 52 to Plaintiff's Motion for Summary

Judgment).

Mr. Bellino similarly stated that he is limited in his

ability to get around: in an April 18, 2003 letter to Michelle

Behm, he stated that he "no longer [has] the ability to 'run

around the Tower', hopping over headset cords, jumping up and

17

around personnel and equipment to 'see' – that my ability to work ground control at Chicago O'Hare without the boxes or the ability to move in a continuous choreographed and rapid manner around the Tower would, at minimum, bring the ground traffic at O'Hare to a stand-still and at worse, would be dangerous." *See* Plaintiff's Motion for Summary Judgment, Exhibit 1. Mr. Bellino also submitted an affidavit, dated September 3, 2006, stating that he "cannot walk like a 'normal' person"; he relies on a cane, but even with a cane, he stumbles and falls and finds it very difficult – and extremely painful – to walk even short distances. *See* Affidavit of Joseph M. Bellino, ¶¶19-20 (attached as Exhibit 73 to Plaintiff's Motion for Summary Judgment).

Craig Burzych, Mr. Bellino's union representative and himself an air traffic controller in the Tower, confirmed in his deposition testimony that Mr. Bellino was limited in his ability to get around. He testified that, in early 2006, he saw Mr. Bellino fall in the terminal and he had to help him get up; he testified that Mr. Bellino tried to use a cane in the Tower, but that, given all the commotion and moving around that is required in the Tower, he could not imagine that Mr. Bellino was "having an easy time" doing his job. *See* Burzych Deposition, pp. 73-75.

In short, the record evidence from mid-2003 and later is unequivocal that Mr. Bellino is seriously restricted in his ability to walk and stand. Based upon this, the Court is

18

satisfied that no reasonable jury could find for the FAA on the disability question, and a finding in Mr. Bellino's favor is, therefore, appropriate on this issue.

The Court next considers the "reasonable accommodation" issue. The ADA defines "reasonable accommodation" as:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). "While the reasonableness of a requested accommodation is generally a question of fact, certain legal standards exist: 'An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it. An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program.'" Owens v. Quality Hyundai, No. 05 C 4325, 2007 WL 495248, at *4 (N.D. Ill. Feb. 15, 2007) (citing Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 775, 784 (7th Cir. 2002)). "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." Sears, 417 F.3d at 802 (citing Jay v. Intermet Wagner, Inc., 233

F.3d 1014, 1017 (7th Cir. 2000). The employer is required, however, "to provide an accommodation that effectively accommodates the disabled employee's limitations." *Id.* (citing *U.S. Airways, Inc. V. Barnett*, 355 U.S. 391, 400 (2002)).

The ADA requires that the employer and employee "engage in an interactive process to determine a reasonable accommodation." *Sears*, 417 F.3d at 797 (citing *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998)). "If a disabled employee shows that [his] disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Id.* (citing *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)).

The parties dispute whether the FAA, in fact, offered Mr. Bellino a reasonable accommodation. The FAA argues that it repeatedly offered him a job at TRACON, a job that could be performed while sitting down, but that he refused the offer each time because he didn't want to give up the increase in pay he received when he went to work in the Tower; the FAA argues that Mr. Bellino wanted a job in TRACON, but he wanted to be paid as if he were still working in the Tower, and that, according to the FAA, was more than the law required it to provide. Mr. Bellino argues that he was never offered a reasonable accommodation; in fact, he initially tried to say that he was never offered a job

at TRACON. Either way, the Court is not persuaded.

On October 21, 2004, Ms. Behm wrote to Mr. Bellino stating that she had determined, based upon his doctor's statement that he was "totally able to perform normal activities of daily living without significant pain or swelling," that he did not meet the regulatory requirements for reasonable accommodation. Nevertheless, she stated, "[s]ince the Tracon in Elgin, IL is in need of air traffic controllers, I will offer you, again, this opportunity to return to the Tracon at C90 if you wish. Your pay will be adjusted to reflect the pay for the facility and location. Therefore, your CIP will be reduced." See October 21, 2004 Letter from Michelle Behm to Joseph Bellino (attached as Exhibit 9 to Plaintiff's Exhibits). Thus, the record evidence supports the FAA's contention.

At his deposition, Mr. Bellino initially denied receiving this letter, and he testified that the FAA had never offered him a job at the TRACON. See Bellino Dep., pp. 41-42, 45, 48, 73-74, 79. In an errata sheet, he later admitted that he had, in fact, received the letter. Thus, it is undisputed that the FAA offered Mr. Bellino a job that everyone agrees he could have performed despite his condition.

On summary judgment, Mr. Bellino has attempted to change gears, arguing, for the first time, that not all of the Tracon controller jobs are sit-down jobs. Mr. Bellino testified at his

deposition that, if someone had offered him the job at TRACON in Elgin, he would have taken it "without caveats." Bellino Dep., p. 43. *See also* Bellino Dep., p. 88-89 (where Mr. Bellino testified that he would have considered the TRACON job to be a reasonable accommodation). He testified that he considered the Elgin TRACON to be a "sit down position." Bellino Dep., p. 55. *See also* Bellino Dep., p. 76 (Q. what jobs are there that would allow for you not to stand more than one or two percent of the day, do you know? A. Jobs that have medical conditions that I have. The radar job. The regional office job. Your job. Q. By "radar" you mean the TRACON job? A. Right.). He later tried to use an errata sheet to back off of those statements. But, as initially made, they are consistent with the rest of the evidence in the record.

Craig Burzych, Mr. Bellino's union representative, testified that it was "a no-brainer" to send him back to TRACON after his injury; he testified that Mr. Bellino had just come from there and there were jobs available, but "they would not do it." Burzych Dep., p. 65-66. He clarified that "they just said flat-out they did not - they would send him back there but only at the C90 CIP [controller incentive pay] rate of 1.6 percent." *Id.*, p. 66. Mr. Burzych explained that CIP is "a differential at - certain facilities across the country get. It's meant to attract and retain controllers at your facility, at hard-to-staff

22

facilities." *Id.*, p. 66. He testified that the CIP rate at the tower was 10% of base pay, but the CIP rate at TRACON was only 1.6% of base pay. *Id.*, p. 66. He testified "they offered to send him back to C90 but not at - without the O'Hare CIP. That was the only issue they ever had." *Id.*, p. 67. He also testified that, in his view and as he read the regulations, reasonable accommodation meant no loss of benefits or pay, meaning that he should have been able to go to the TRACON, but he should have been able to take his O'Hare CIP with him. Burzych Dep., p. 68. Mr. Burzych testified that the TRACON job would have been perfect for Mr. Bellino; it was the money; "[t]hey did not want to pay him CIP." Burzych Dep., p. 128-29.

Fundamentally, arguing that the air traffic controller job at the TRACON isn't a sit-down job does little to further Mr. Bellino's claims and strikes the Court as being a bit disingenuous. Either the job offered was a sit-down job, in which case the FAA offered him a reasonable accommodation; or the job was not a sit-down job, in which case he could not have done it anyway. This is especially significant because Mr. Bellino has the burden to show that there were jobs available that he was capable of doing; the Tracon air traffic controller job is the only job for which he has offered such evidence. At his deposition, he testified that there were "labor relations positions there at the regional office. There are Plans and

23

Procedures. There are air space redesign. All of these things.
I've been training in NTSB investigation. I have 40 years of
experience. I know that there is some things I could do
somewhere." Bellino Dep., pp. 55-56. Yet, he admitted that he
had no idea whether there were any openings in any of the
positions he mentioned. *Id.*, p. 56. He did nothing to help
himself with the following exchange:

> Q. Do you have any – what jobs are there that would
> allow for you not to stand more than one or two percent
> of the day, do you know?
> A. Jobs that have medical conditions that I have. The
> radar job. The regional office job. Your job.
> Q. By "radar" you mean the TRACON job?
> A. Right. Your job I could do.

Bellino Dep. P. 76.

The FAA has argued that Mr. Bellino's claim, distilled to
its essence, is that the TRACON job was a "reasonable
accommodation" only if he was allowed to take his O'Hare Tower
10% CIP with him. To be sure, Craig Burzych's testimony supports
this theory, as does a substantial amount of other evidence in
the record. And the theory permeates his arguments on summary
judgment. He argues in his brief, for example, that Ms. Behm
never offered him a reasonable accommodation, and that she
admitted that she never offered him a reasonable accommodation.
To support this, he cites Tim Fitzgerald's deposition testimony,
in which Mr. Fitzgerald did, in fact, testify that Mr. Bellino
was never offered a reasonable accommodation. But, when read in

24

context, Mr. Fitzgerald's conclusion on this issue is based upon
his belief that, if Mr. Bellino did not get to take his O'Hare
Tower CIP with him to the TRACON, the offer of a job at the
TRACON did not constitute a reasonable accommodation, *see*
Deposition of Tim Fitzgerald, Exhibit 63, pp. 37-39. That was
clearly Mr. Bellino's view of the world; and it was also Craig
Burzych's view of the world. But it is not clear where that view
comes from; it certainly finds no support in the federal
statutes. Interestingly, Mr. Fitzgerald testified that his
understanding of what constitutes a reasonable accommodation is
based on what Mr. Bellino told him. *Id.*

In truth, Ms. Behm never admitted that she failed to offer
Mr. Bellino a reasonable accommodation; nor does the FAA. The
FAA's position is clear and unequivocal: it offered Mr. Bellino
the job at the TRACON, but without the CIP, and that was a
reasonable accommodation. That is supported in the law. To be
clear, the job the FAA offered Mr. Bellino paid the exact same
salary as the job he was working when he fell off the stool; it
just didn't pay as high a bonus as the O'Hare Tower job did.
There is nothing in the Rehabilitation Act, or in the regulations
promulgated under the Act, that requires an employer to pay a
disabled employee a bonus that is otherwise unavailable in the
new position. And to the extent Mr. Bellino believes otherwise,
his belief reflects a fundamental misunderstanding of what

constitutes a reasonable accommodation. To the extent Mr.
Bellino is claiming that some worker's compensation provision
required the FAA to pay him the same combined salary package that
he earned in the job he could no longer do, then he should have
pursued that claim with the Office of Workers' Compensation
Programs; the failure to offer to pay the higher CIP does not run
afoul of the Rehabilitation Act. *See Brotherhood of Maintenance
of Way Employees v. CSX Transportation Inc.*, 478 F.3d 814, 818
(7th Cir. 2007)(the concept of "reasonable accommodation" does
not require an employer to take action that would be inconsistent
with provisions in a collective bargaining agreement)(citing
*Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir.
1995)).

Moreover, even if Mr. Bellino could show that he was not
offered a reasonable accommodation, his claim could only succeed
if the FAA was responsible for the breakdown in the interactive
process that is supposed to occur in the wake of the employee's
request for an accommodation. *E.g., Sears*, 417 F.3d at 797
(citing *Beck v. University of Wisconsin Board of Regents*, 75 F.3d
1130, 1137 (7th Cir. 1996). To be sure, the process as it played
out here was less than perfect and clearly adversarial. No doubt
that has something to do with the personalities involved; there
is, without question, no love lost between Ms. Behm and Mr.
Bellino. But the law does not punish an employer for failing to

26

host an ideal interactive process; rather, it punishes an employer only where it is responsible for the breakdown in the process. Here, there is no evidence that that is the case. On the contrary, the documentary evidence in the record shows that, on October 21, 2004, the FAA offered Mr. Bellino the very job he and everyone else agreed was perfect for him in his impaired state; yet, the next day he responded with a letter that failed even to acknowledge that offer, instead offering only arguments and accusations. To be sure, he offered nothing to further the process, no reason for his implied refusal of the TRACON job, no alternative suggestions for other positions, etc. For this reason, and because the Court finds that no reasonable jury could conclude that the FAA failed to offer Mr. Bellino a reasonable accommodation, the Court will enter summary judgment in the FAA's favor on the discrimination claim.

C.    Mr. Bellino's Retaliation/Hostile Environment Claim

In his complaint, Mr. Bellino claims that Ms. Behm retaliated against him because he pursued EEO claims both on his own behalf and, in his capacity as a union representative, on behalf of other FAA employees. To survive summary judgment on his retaliation claim, Mr. Bellino must offer evidence that he engage in a statutorily protected activity; that he suffered an adverse action; and that there was a causal connection between the two. See Burks v. Wisconsin Department of Transportation,

27

464 F.3d 744, 758 (7th Cir. 2006)(citing *Haywood v. Lucent Technologies*, 323 F.3d 524, 531 (7th Cir. 2003)). Even if Mr. Bellino could show that he suffered an adverse employment action – and, as explained above, he cannot; the Court rejects his claim that he was denied a reasonable accommodation – he cannot establish that his EEO activities were the cause of that action.

At his deposition, Mr. Bellino testified that he was claiming that Ms. Behm retaliated against him for representing people in EEO proceedings who were making claims against her; yet, he admitted that he could "only guess" or "only assume" that she was motivated by retaliation for those protected activities; he admitted that he had no evidence of any retaliation or any retaliatory motive. *See* Bellino Deposition, pp. 54-57 (Exhibit 58). He testified that he has no evidence that Ms. Behm retaliated against him because of his EEO activities; he testified that he represented many people in EEO claims, and then Ms. Behm refused to provide a reasonable accommodation; he can only infer that the former was the cause of the latter. Bellino Dep., pp. 54-57. Similarly, Craig Burzych, Mr. Bellino's union representative, testified that Ms. Behm, "made it a personal issue. I think she just took the whole thing personal for whatever reason. And she was going out of her way, to be honest with you, to – you know, to fight this and to give him a hard time, to be honest with you." Burzych Dep., p. 71; *see also*

28

Burzych Dep., pp. 111-112. Yet, he offered nothing suggesting
that her behavior had anything to do with Mr. Bellino's EEO
activities. Stanley Estes, a retired air traffic controller who
supervised Mr. Bellino for a time, testified that Ms. Behm had a
"hit list," and that Mr. Bellino was on it because of his EEO and
union background." Estes Dep., pp. 17-18, 67. Yet, he could
offer no explanation for his belief. Certainly, this would have
been the time for Mr. Bellino to offer his evidence on the point,
and his failure to do so is telling. *See Hammel v. Eau Galle
Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)("Summary
judgment is not a dress rehearsal or practice run; it 'is the put
up or shut up moment in a lawsuit, when a party must show what
evidence it has that would convince a trier of fact to accept its
version of the events.'")(quoting *Schacht v. Wisconsin Dept. Of
Corrections,* 175 F.3d 497, 504 (7th Cir. 1999)).

     Mr. Bellino could also survive summary judgment on his
retaliation claim by showing, under the indirect approach, that
he engaged in a protected activity, that he suffered an adverse
employment action, that he was performing his job satisfactorily,
and that similarly situated employees who did not engage in
protected activity were not subject to adverse employment actions
as was he. *Burks*, 464 F.3d at 759 (citing *Stone v. City of
Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th
Cir.2002). But the record is clear that he could not perform his

job satisfactorily; and he has made no attempt to show that a similarly situated employee who did not engage in EEO activity was treated better than he was.

Mr. Bellino has also characterized his claim as one alleging a hostile work environment. The Seventh Circuit has assumed that such a claim is cognizable under the Rehabilitation Act. *See Norris v. Principi*, No. 03 C 4923, 2006 WL 2355591, at *8 (N.D. Ill. Aug. 11, 2006). But, to survive summary judgment on such a claim, Mr. Bellino must put forth evidence to show, among other things, that he was subjected to unwelcome harassment *because of his disability or his prior EEO activities. See id.* (citing *Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004). He has failed to offer any evidence to support either point. Although he argued that Ms. Behm harassed him by refusing to offer him a reasonable accommodation, the evidence shows that she did offer him a reasonable accommodation. Even Mr. Estes, who flatly says that Ms. Behm was out to get Mr. Bellino, says nothing about what she actually did that amounted to harassment. And, even if he could show that Ms. Behm treated him badly or harassed him, there is simply no evidence that she would have done so because of his disability or his prior EEO activities. The best he can offer is his "guess" and Mr. Estes' belief, and that is just not enough to get to a jury. Accordingly, the Court finds that summary judgment in the FAA's

favor is appropriate on count 2 of Mr. Bellino's Second Amended
Complaint, whether that claim is interpreted as a retaliation
claim or a hostile environment claim.

## Conclusion

For the reasons set forth above, Mr. Bellino's motion to
strike defendant's Rule 56.1 statement [#130] is granted as to
exhibits 11 and 15 and paragraph 8, but is otherwise denied; Mr.
Bellino's motion to strike some of defendant's additional
exhibits [#143] is granted as to exhibits 65-67, 72, 74, 77-80,
86 and 87, but is otherwise denied. Additionally, as explained
above, the Court finds that Mr. Bellino cannot make out a *prima
facie* case of discrimination based upon a failure to provide a
reasonable accommodation; nor can he prove that he was retaliated
against or harassed because of his disability or because of his
EEO activities. Accordingly, the Court finds that summary
judgment in the defendant's favor is appropriate. Accordingly,
the Court grants the Secretary's motion for summary judgment
[#108] and denies Mr. Bellino's motion for summary judgment
[#111].

Date: April 9, 2007

ENTER:

ARLANDER KEYS
United States Magistrate Judge

31